IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| CARLOS WILTSHIRE | : | No. 11-310 |
| a/k/a "Shawn Carter" | : | |
| a/k/a "Shake" | : | |

## MEMORANDUM

PRATTER, J.                                                    DECEMBER 7, 2020

Defendant Carlos Wiltshire seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The bases for his motion are the prevalence of COVID-19 throughout the facility where he is currently incarcerated and his medical issues placing him in a higher risk category for COVID-19. The Government disputes the merits of the motion. For the following reasons, the Court denies the motion.

### BACKGROUND

**I.      Mr. Wiltshire's Criminal Conduct**

Ten years ago, Mr. Wiltshire was arrested for drug trafficking. Unbeknownst to him, a confidential source had purchased crack cocaine from Mr. Wiltshire. Those controlled buys served as a basis to obtain search warrants. Law enforcement personnel stopped Mr. Wiltshire in a car, read him his *Miranda* rights, and explained the search warrants. Mr. Wiltshire acknowledged that he understood and agreed to speak with the detective, including identifying his residence which he shared with his girlfriend. He was then searched. Twenty transparent blue plastic baggies, each containing crack cocaine, were found on his person.

Mr. Wiltshire was then arrested and transported to his apartment where law enforcement personnel conducted a search of the premises. Once there, Mr. Wiltshire admitted that there were drugs, guns, and drug paraphernalia in the apartment. He directed the detective to a shoebox which contained a digital scale, a bag of 3.5 grams of bulk crack cocaine, 17 baggies of crack cocaine, unused baggies, a razor blade, and papers for a football pool with Mr. Wiltshire's nickname, "Shawn Carter," on it. Mr. Wiltshire acknowledged that "Shawn Carter" was his alias. Officers located a second shoebox with a table of numbers written on the top of the box. The Government's drug trafficking expert later testified that this table represented Mr. Wiltshire's drug selling records. Additional materials for packaging drugs, including a plate, spoon, and bag containing the same type of baggies recovered off of Mr. Wiltshire, were found in the apartment. Residue on the plate tested positive for cocaine. Mr. Wiltshire admitted these items belonged to him and that he sold crack cocaine.

In addition to the drugs and drug paraphernalia, officers recovered a loaded gun from under Mr. Wiltshire's mattress, and two boxes of ammunition and an American Body Armor bulletproof vest from his closet. During the search, Mr. Wiltshire admitted that the gun and the vest were his.

### A. Trial

Mr. Wiltshire decided to proceed to trial and to testify in his defense. He admitted that he was a drug dealer and that the crack cocaine found on him and in his apartment was his.

However, he denied everything else, including that the gun, vest, and shoebox with writing were his, that he used the alias "Shawn Carter," that he had occupied the apartment for more than one day, and the identity of his girlfriend. These denials were belied by the statements he previously made to law enforcement and on consensually recorded phone calls to his girlfriend while in custody.

## B. Sentencing

Mr. Wiltshire was convicted of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g); and possession of body armor following a conviction for a violent crime, in violation of 18 U.S.C. § 931. He was initially sentenced to a within-guidelines range of 267 months, based on a finding that the Armed Career Criminal Act applied. Following the Supreme Court's decisions in *Johnson v. United States*, 576 U.S. 591 (2015) and *United States v. Mathis*, 136 S. Ct. 2243 (2016), the Court granted a resentencing because Mr. Wiltshire was no longer subject to the ACCA.

Mr. Wiltshire's sentenced was reduced to 180 months, to be followed by six years of supervised release, a $3,000 fine, and a $300 special assessment. The resentence represented an upward variance from the guidelines range. This was based on Mr. Wiltshire's criminal history, his perjury during the proceedings, previous repeated violations while on probation, and a history of domestic violence. To wit, Mr. Wiltshire's past 13 offenses included (1) two convictions for attempted robbery; (2) a conviction for fourth degree grand larceny where Mr. Wiltshire robbed the victim at gunpoint; (3) a conviction for receiving stolen property; (4) two convictions for delivering heroin in a school zone; (5) three convictions for possession of a controlled substance; (6) two convictions for driving with a suspended or revoked license; (7) a conviction for disorderly conduct where he broke the windows of an ex-girlfriend's car; and (8) a conviction for false identification to law enforcement.

The Court explained that Mr. Wiltshire's conviction for drug trafficking was "very serious." Considering his past actions, this crime was not a "one-time mistake." Instead, his

conduct—including his perjury when he testified in his own defense—was indicative of a troubling pattern and general disregard for laws and law enforcement.

### C. Incarceration

Mr. Wiltshire is serving his sentence at Beaumont Low FCI in Texas with an anticipated release date of January 25, 2024. He has served approximately 114 months and has earned nearly 17 months credit for good conduct. Mr. Wiltshire thus is credited with served about 72% of his sentence.

While incarcerated, he has incurred nine disciplinary sanctions, including four in the last six months for entry into an unauthorized area, refusing a work assignment, possession of an unauthorized item, and possession of a hazardous tool. For possessing the hazardous tool, Mr. Wiltshire was transferred from the minimum-security satellite camp at Beaumont to its low-security facility. He also forfeited 41 days of good conduct time, 280 days of visiting and phone privileges, and incurred a $30 fine.

### II. Mr. Wiltshire's Request for Compassionate Release and Medical Records

Mr. Wiltshire states that he made a request upon his facility's warden for compassionate release but received no response within 30 days. Doc. No. 148 at 3. The Government does not take issue with this contention and accepts that he has exhausted his request for administrative relief. In October 2020, Mr. Wiltshire filed this motion. He seeks relief based on his diagnosed hypertension, his prior COVID-19 infection, and the recent uptick in positive cases within the Bureau of Prisons system.

Mr. Wiltshire's medical records for the past two years reveal that he is mildly obese and has hypertension, elevated LDL cholesterol, allergies, shoulder pain, and a decayed tooth. He refused medication for the elevated LDL and an extraction for the decayed tooth. Mr. Wiltshire's

other conditions are presently controlled with medication provided by his institution. Mr. Wiltshire tested positive for COVID-19 roughly five months ago. He was asymptomatic and has since recovered. He is reportedly fully ambulatory and engages in all normal activities of daily living within the prison.

### III.    BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring

---

[1]     BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Dec. 8, 2020).

[2]     BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 8, 2020).

5

to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

As to the current situation at Beaumont Low FCI, the Court in no way minimizes the threat that COVID-19 poses. As of December 8, 2020, the facility reports that 223 inmates and one staff member are currently COVID-positive. Overall, at this facility, 853 inmates and four staff members previously positive for COVID-19 have since recovered.[4] Thus far, the facility has isolated any inmate who tests positive while they are treated and recovering. And the BOP website continues to provide transparent information with the community about positive cases and recoveries.

## Legal Standard

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons

---

[4] The data is current as of December 8, 2020, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5] "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[6] The Government does not contest that Mr. Wiltshire has met the exhaustion requirement.

7

warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense,

---

[7]  Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

8

to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Without a doubt, all segments of our society have been experiencing the unprecedented magnitude of the COVID-19 pandemic. The Court certainly does not minimize the critical health risk posed by COVID-19. But as concerning as the current pandemic is, resolving Mr. Wiltshire's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Wiltshire argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) given his diagnosed hypertension and his previous bout of COVID-19. But to be eligible for release, Mr. Wiltshire must point to an extraordinary and compelling reason. He cannot do so here.

Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[8] "While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

---

[8] *See People at Increased Risk*, Centers for Disease Control and Prevention (Nov. 30, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Dec. 4, 2020).

9

*First*, contrary to his claim, there is no evidence that Mr. Wiltshire suffers from a condition that is considered "high-risk." The Government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 n.1. The CDC has recently revised its list of people with certain medical conditions who "are at increased risk of severe illness" from COVID-19.[9] The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. Essential hypertension falls into this "might" category.[10] None of Mr. Wiltshire's other conditions are considered high-risk by the CDC.

Courts routinely deny motions for the extraordinary remedy of compassionate relief based on potential COVID-19 risk factors, like hypertension. *See, e.g., United States v. Moldover*, No. CR 14-637, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (defendant's asthma, hypertension, and obesity did not constitute extraordinary and compelling reason for release); *United States v. Ackerman*, No. CR 11-740-KSM-1, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) (compassionate release not warranted because "there is no there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care"); *United States v. Daniels*, No. CR 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug.

---

[9] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 8, 2020).

[10] Mr. Wiltshire's medical records state that he has "unspecified essential" hypertension, a distinct diagnosis from the more severe pulmonary hypertension. The CDC recognizes only the latter as a "serious heart condition" that increases an individual's risk of severe illness from COVID-19. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1. 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 8, 2020).

12, 2020) ("hypertension does not warrant compassionate release"). Moreover, Mr. Wiltshire does not establish that his hypertension—which is monitored and treated with medication—has made him especially vulnerable or is somehow not under control.

*Second*, the risk of reinfection after a prior positive test for COVID-19 is a not basis for compassionate release here. Presently, there is no scientific consensus on the risk of reinfection. Because COVID-19 poses a general threat to every non-immune individual, the mere existence of the disease does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). This is especially so where, as here, a defendant does not present another risk factor. Although Mr. Wiltshire previously tested positive for COVID-19, he had the good fortune to be asymptomatic and has made an apparent full recovery. He does not point to any long-term health consequences, let alone one that constitutes an extraordinary and compelling reason. Mr. Wiltshire does not dispute or challenge the care and treatment he received from the medical staff at Beaumont after he tested positive.

Moreover, this Court is unable to find a case granting compassionate release to a defendant who recovered from COVID-19 and was asymptomatic. To the contrary, the consensus is that such a circumstance does not warrant release. *See, e.g.*, *United States v. Norcross*, No. 8:05-CR-291-T-02JSS, 2020 WL 5076578, at *2 (M.D. Fla. Aug. 27, 2020) (denying motion for release where defendant had hypertension and recovered from COVID-19); *United States v. Peuse*, No. 17-CR-00598-LHK, 2020 WL 5076356 (N.D. Cal. Aug. 24, 2020) (collecting cases).

*Finally*, the Government notes in passing that Mr. Wiltshire's body mass index is 26. The CDC identifies obesity—measured as a BMI of 30 or greater—as presenting an increased risk of severe illness from COVID-19. Being overweight, defined as a BMI between 25 and 30, might increase a person's risk. But a qualifying medical condition, as detailed in the above guidelines

11

policy statement, is only one in which the inmate is "not expected to recover." And, in general, courts have been reluctant to grant compassionate release based solely on obesity—let alone overweight. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[O]besity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."); *United States v. Grasha*, No. 18-cr-325, 2020 WL 5747829, at *5 (W.D. Pa. Sept. 24, 2020) (finding defendant's obesity and BMI of 48, while presenting a serious risk, did "not arise to an extraordinary and compelling reason for release").

So Mr. Wiltshire's medical conditions and history do not present an extraordinary and compelling reason for his compassionate release.

But even if Mr. Wiltshire presented an extraordinary and compelling reason to warrant his release, consideration of the § 3553(a) factors necessitate a denial of Mr. Wiltshire's motion.

Although it is his burden to show that a reduction in sentence in proper, Mr. Wiltshire has failed to make any showing that an early release aligns with the statutory sentencing factors, notably the seriousness of his offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a). Construing his motion liberally, Mr. Wiltshire points only to his having served most of his sentence. This is insufficient.

A reduction in sentence is not appropriate here given the need for adequate deterrence and to protect the public from future crimes. Mr. Wiltshire's underlying crime—selling crack cocaine—is serious. And the Court is especially troubled by Mr. Wiltshire's recidivism, as evidenced by his extensive criminal record, including 13 prior convictions, documented poor behavior and offenses while on probation, and obstruction of justice in this case. Although some

of Mr. Wiltshire's prior offenses may be less serious than others, he has not abandoned his criminal lifestyle. Nor has he made any showing of an attempt at rehabilitation while incarcerated. To the contrary, he has received four infractions in the past six months.

Even if Mr. Wiltshire presented a serious medical condition, the gravity of his crimes and the danger posed to the community warrant the sentence he received. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Wiltshire's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE